

**IT IS HEREBY ADJUDGED and DECREED that the
below described is SO ORDERED.**

**Dated: July 21, 2023.**

_____
**CRAIG A. GARGOTTA
CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 22-50804-CAG |
| | § | |
| AUSTIN TRAVIS STEVENS, | § | CHAPTER 7 |
|     Debtor. | § | |

| | | |
|---|---|---|
| JUDY GABBERT AND | § | |
| JEFFERY GABBERT, | § | |
|     Plaintiffs, | § | |
| | § | ADV. NO. 22-05073-CAG |
| v. | § | |
| | § | |
| AUSTIN TRAVIS STEVENS | § | |
| | § | |
|     Defendant. | § | |

### MEMORANDUM OPINION ON PLAINTIFFS'
### COMPLAINT FOR DETERMINATION OF DISCHARGEABILITY OF DEBT

Came on to be considered for trial on May 30 and 31, 2023, the Plaintiffs' Complaint for

Determination of Dischargeability of Debt. (ECF No. 1).[1] For the reasons stated herein, the Court

---

[1] "ECF" denotes electronic case filing number.

finds that the Defendant's debt to Plaintiffs is nondischargeable pursuant to 11 U.S.C. § 523(a)(2) and (a)(4).

As an initial matter, the Court finds that it has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding as defined under 28 U.S.C. § 157(b)(2)(I)(determination of dischargeability of debt). The Court finds venue is proper under 28 U.S.C. § 1408. This matter is referred to the Court pursuant to the District's Standing Order on Reference. The Court makes its findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. Unless specifically stated otherwise, all statutory references are to the United States Bankruptcy Code, 11 U.S.C. __ *et seq.*

### BACKGROUND

Judy and Jeffery Gabbert (mother and son) ("Plaintiffs") wanted to build a small home on Judy Gabbert's homestead property for the benefit of Mrs. Gabbert's daughter and minor child. The Gabberts placed an ad to have trees removed off the property so that construction could begin. Austin Travis Stevens ("Defendant") answered the ad and agreed to remove the trees. During the course of the parties' initial meeting, Defendant told the Plaintiffs that he was a custom home builder and could build the home for them at an agreed upon price of $90,000.00. No contract to build the home was ever reduced to writing. Defendant built a pier and beam foundation on the property. Defendant ordered building materials such as wood for the framing of the house and windows. The construction of the home lagged, and the Plaintiffs became impatient with Defendant's progress. During the course of the dealing between the parties a dispute arose regarding the square footage of the property. The Plaintiffs believed that Defendant had provided drawings for the construction of 1,200 sq. ft. of livable space.[2] Defendant said that the proposed

---

[2] "Livable space" is defined as square footage that is heated and air conditioned.

plans were for 600 sq. ft. of livable space and 600 sq. ft. of storage. As such, Defendant advised the Plaintiffs that it would cost Plaintiffs additional money to finish out the proposed home. Plaintiffs argued that the agreed upon price of $90,000.00 was for 1,200 sq. ft. of livable space. The dispute over the correct amount of square footage, coupled with the delays in framing and finishing out the house, caused the parties to reach an impasse in which Defendant withdrew from the project and Plaintiffs sued for recovery in state court. The state court action precipitated Defendant's filing of his chapter 7 bankruptcy. The Plaintiffs filed this adversary proceeding to contest the discharge of their claim under § 523(a)(2) and (4) and related state law causes of action.

## PARTIES' CONTENTIONS

Plaintiffs allege that Defendant failed to provide competent management of the job, including such deficiencies as professionally installing the foundation and ordering a sufficient amount of lumber and windows to complete the job. Further, Plaintiffs allege that Defendant embezzled from Plaintiffs; Defendant made false representations regarding his competency as a home builder and ability to perform on the project; and that Defendant committed defalcation as a fiduciary to the Plaintiffs.

In response, Defendant denies all of Plaintiffs' allegations and argues that Defendant told Plaintiffs that a 600 sq. ft. home of livable space was not practical; that Plaintiffs never told Defendant what the upstairs of the proposed home was going to be used; and that there was no written contract between the parties; therefore Defendant cannot be liable for Plaintiffs' claims.

## STIPULATIONS OF FACT

As part of the parties' Joint Pre-Trial Order (ECF No. 34), the parties stipulated as to the following facts.[3]

---

[3] Not all of the stipulated facts are incorporated into this Memorandum Opinion because not all the stipulations are relevant to the Court's decision.

Plaintiffs wanted to build a home on Mrs. Gabbert's property so that Mrs. Gabbert's daughter and grandchild could live on the property. Plaintiffs were willing to pay a turnkey price of $90,000.00 for the construction of the home. Defendant answered an ad to clear trees from Plaintiffs' property. Defendant represented that he was an experienced home builder and that he could build a superior home in a timely manner. Mrs. Gabbert relied on Defendant's representations and took out a home equity loan on her home for $90,000.00 at 3.45 percent rate of interest. During the course of the construction, Defendant admits that Plaintiffs paid him $75,550.00 for the purchase of building materials and construction of the home. Defendant admits that he did not supervise the construction of the foundation of the home.

Defendant stipulated that he purchased products and supplies that were not delivered to the job site. Stevens also stipulated that he invoiced for work that was not finished, and, that he has not returned any of the remaining money that Plaintiffs paid him.

Defendant also stipulated that all the work on the house stopped at the foundation stage and that framing and cornice work on the house was not completed. Defendant admits that he only paid the following subcontractors, laborers, materialmen, or suppliers in the amounts listed:

Cains Decorative Concrete and Foundation - $11,500.00

JM Contracting - $7,500.00

Murphy Brothers Electrical - $2,200.00

JT Architectural Designs - $1,900.00

MG Building Materials - $21,981.00.

The total amount paid is $45,081.00.

Defendant also admits that he invoiced Plaintiffs in the following amounts for work performed:

Invoice no. 000198 for engineering plans - $2,500.00

Invoice no. 000200 for site work and temporary electric - $7,500.00

Invoice no. 000201 for underground utilities trench - $9,800.00[4]

Invoice no. 000206 for pier and beam installation - $18,000.00

Invoice no. 000207 for framing and lumber package - $37,500.00

Total amount of invoices is $75,300.00.

Defendant admits that the Plaintiffs paid all the invoices. Stevens also stipulates that the Gabberts are consumers as defined under the Texas Deceptive Trade Practices Act ("DTPA").

### FINDINGS OF FACT

The Plaintiffs and Defendant testified at trial. The Court finds all three witnesses credible and has weighted their testimony in comparison to the stipulated facts and admitted exhibits. Plaintiffs' Exhibits 1-18 ("P- _") were admitted. Defendant's Exhibits 1-7 ("D-_") were admitted. Some of the trial testimony provided was repetitive of the stipulated facts. The Court will not repeat that testimony in this Memorandum Opinion and will only include relevant testimony that relates to the Plaintiffs' claims for relief. The Court summarizes each witness's testimony as follows:

<u>Defendant Austin Travis Stevens</u>

Defendant uses only one bank account for his personal and business expenses, and deposits all business income into a Randolph Brooks Federal Credit Union ("RBFCU") checking account.[5] Stevens was asked about if he deposited all of the Gabberts' payments into the RBFCU account which Stevens acknowledged that he did. Further, Defendant stated that he also paid any invoices

---

[4] There is a withdraw of $9,800.00 from Defendant's RBFCU account on March 24,2021, but no supporting receipts.
[5] (P-1) – (P-5) are Defendant's RBFCU bank statements for December 2020 – April 2021.

for the Gabbert project from this account.[6] Defendant stated that he also used the RBFCU account as his personal checking account as well and paid his living expenses from the RBFCU account. Notably, after Defendant deposited the Gabbert payments into the RBFCU account, Defendant would then use some of the funds to pay for personal expenses, including a trip to Las Vegas.

Stevens stated that he did order building plans for the Gabbert home at a non-refundable cost of $2,500.00. (P-7). The invoice for the architectural and building plans does not indicate the square footage for the home, only the cost of $90,000.00. (*Id.*). Plaintiffs' Exhibit 12 is the architectural plans for the proposed home. On page 2 of the plans, the plans indicate a front porch of 277 sq. ft., a first floor living area of 744 sq. ft., and a second floor living area of 277 sq. ft., for a total of 1,021 sq. ft. of area. There is no indication on the plans for a home of 1,200 sq. ft. Further, as to what data the architectural firm used in drawing the plans, Defendant testified that he gave the architect oral instructions on the square footage for the home. Defendant argued that the building plans (P-17) he gave the Gabberts were generic in nature and did not represent 1,200 sq. ft. of living space, but rather 600 sq, ft. of livable space and 600 sq. ft. of attic space. Stevens testified that he told the Plaintiffs that the plans they purchased were for 600 sq. ft. downstairs and a loft upstairs of roughly 600 sq. ft. for children. Also, Defendant stated that there were no change orders associated with the construction of the home, and that Defendant believed that he was building a house with 600 sq. ft. of livable space.

Defendant stated that he does not have any formal training in construction nor is he an architect. Defendant is a high school graduate with no college hours earned. Stevens testified that he knows how to estimate the cost of a home building project without the benefit of any formal

---

[6] Defendant's testimony revealed that of all the client invoices he produced in discovery, the majority were for the Gabberts. (P-7) – (P-11). As such, based on the produced invoices, it does not appear that Defendant had many other clients other than the Gabberts.

training. Defendant stated that he had another custom home business, Catalyst Custom Home, LLC, but it forfeited its LLC status due to nonpayment of franchise taxes. Defendant maintained that he has the requisite skill and knowledge to build a home to plans and provide superior workmanship. Defendant disputed Plaintiffs' assertion that Defendant needed to have permits to dig an electrical line to bring electricity to the home, build the foundation, and complete the home. Defendant maintained that any permits for the property should be obtained by the owners.

The Court was provided with pictures (P-13) of the pier and beam construction for the Gabbert home. Stevens was also asked if the pier and beam foundation comported with the proposed drawings and plans. Defendant stated that the foundation was to specifications. Stevens did not, however, supervise the construction of the foundation. Moreover, there was no survey conducted of the site before and after the foundation was installed. Although the Court does not have a construction background, the beams are not straight nor is there the required flashing and rebar on the piers.

Stevens stated that he quit working on the project because the Gabberts refused to pay more than $90,000.00 to finish the project. Defendant said that Plaintiffs instructed him to discontinue working. Defendant said he offered to refund any monies he held from Plaintiffs' payments, but Plaintiffs did not accept the payments. Stevens acknowledged that he left wood for framing the house on the premises unprotected from the weather and that Defendant still had the windows ordered for the Gabberts at his residence. Stevens stated that he was told not to return to the Gabberts' home, and thus was unable to return the lumber to the supplier. Defendant testified that had he not paid all the subcontractors for the project, material and mechanic's (M&M) liens would have been filed against the property. There was no evidence of any M&M liens filed. Defendant did not provide evidence of any invoices for payment of labor or overhead. Further, a review of

Defendant's RBFCU bank account statements does not indicate any payments or withdraws for labor or overhead costs for the Gabberts' project.

Plaintiff Jeffery J. Gabbert

Jeffery Gabbert ("Jeffery") is Judy Gabbert's son. He grew up on the Gabbert's homestead property. Jeffery is knowledgeable about his mother's property and represented his mother in dealing with the Defendant. As stated in the parties' stipulations, Jeffery met with the Defendant when the Defendant cleared the trees on the property and talked with Defendant directly about constructing a small home on his mother's property. Jeffery stated that Defendant told him that he was a custom home builder with experience. Jeffery had regular contact with Defendant by phone and text. (P-17). Jeffery testified that Defendant was non-responsive to his concerns and questions about the building process and was evasive about when work would be completed. Jeffery also testified that his understanding was that Defendant was to build a $1,200 sq. ft. home of livable space for $90,000.00. Jeffery complained about the lumber being left on the property after Defendant was terminated, and that Defendant failed to retrieve the lumber and materials and return them to the supplier for a refund.

Plaintiff Judy Gabbert

Judy Gabbert ("Judy") is one of the homeowners of the property where Defendant was to build the home. Judy explained that her grandchild has serious emotional problems and that she wanted to build a small home on her property for the benefit of her daughter and grandchild. Judy originally decided to place an ad for tree removal and then subcontract out the work for the construction of the home. Judy stated that her son Jeffery talked with Defendant about his home building experience after Defendant removed the trees for Judy's property. Judy testified that Defendant stated he had eight years' experience as a builder and fourteen years' experience in

construction. Also, Judy stated that Defendant told her that he was licensed and insured. Judy did not ask nor was she told about having permits for the construction of the home on her property. Judy said that Defendant was only on the property for the tree removal and not present for the foundation construction. Judy explained that she took out a home equity loan on her homestead for $90,000.00 at a rate of 3.45 percent rate of interest for a term of 240 months.

Judy said that when the pier and beams were installed, the Defendant did not use any rebar or flashing to strengthen the beams. After Defendant was terminated, the foundation began to fall into disrepair. Judy's husband became concerned about the foundation being a nuisance to their grandchild, so Judy's husband decided to knock down the wooden beams. The piers remain where they were constructed, and Judy's husband put some of the remaining wood in their garage or left it on the build site.

### ANALYSIS

The Plaintiffs identified different claims for relief depending on the status of the litigation. There is no dispute that the Complaint (ECF no. 1) seeks a nondischargeability determination for fraud under § 523(a)(2)(A) and a claim for embezzlement and or defalcation under § 523(a)(4). The Complaint also states a claim for relief under the Texas Deceptive Trade Practices Act ("DTPA"). The Plaintiffs also assert a claim for relief under the Texas Civil Practices and Remedies Code, § 134.001-.005 for the unlawful appropriation of property. Plaintiffs ask for damages under the DTPA pursuant to § 17.50(b)(1). Plaintiffs also seek reimbursement for remediating the property to remove the foundation, materials, and debris from the property. Plaintiffs argue that the Defendant's conduct was willful and malicious (raising a potential claim under § 523(a)(6) and that Plaintiffs recover exemplary damages based upon Defendant's fraud and willful and malicious conduct. Plaintiffs allege that they are entitled to the attorney's fees and costs.

The Joint Pretrial Order (ECF no. 34 at pp. 1-2) states that the Defendant should be denied a discharge under § 523(a)(2) and (a)(6). Under the heading "Gabbert/Steven's Contested Issues of Law" (*Id*. at pp. 7-8), the parties identify the same claims for relief as contained in the Complaint. At trial, Plaintiffs argued that Defendant violated the provisions of the Texas Property Code, § 162.031, alleging that Defendant had a fiduciary relationship with the Plaintiffs and that the money paid to Defendant were funds to be held in trust for the construction of the Gabberts' home. Plaintiffs argued that Defendant had a duty to treat the Gabberts' payments as trust funds and to not to use those funds for personal expenses.

Given this confusion, the Court will analyze whether the Defendant committed fraud under § 523(a)(2) and embezzlement or defalcation under § 523(a)(4). The Court will also consider whether Defendant has a claim for relief under the DTPA, § 17.50(b)(1). The Court will not consider any claim for relief under § 523(a)(6) because it was not properly pled or included in the Joint Pretrial Order. Finally, any violation of the Texas Property Code, § 162.031 will not be considered because the construction trust fund provision under the Texas Property Code was not pled.

### FRAUD UNDER § 523(A)(2)(A)[7]

Plaintiffs have pled in their Complaint that Defendant made false representations that he could build a house for $90,000.00 within a reasonable amount of time that was of sufficient quality and workmanship. As such, Plaintiffs' § 523(a)(2)(A) claim is based on false representations or misrepresentations, and not actual fraud.

---

[7] The discussion of § 523(a)(2)(A) is adopted from this Court's Memorandum Opinion in *Texas Capital Bank, N.A. v. Womack (In re Womack)*, Adv. No. 21-05071, 2022 WL 2659412. at *8-10 (Bankr. W.D. Tex. July 8, 2022), *aff'd*, No. 5:22-cv-00965 (W.D. Tex. July 7, 2023).

An individual may not obtain discharge of debts incurred through his own wrongful conduct. *In re Tegeler*, 586 B.R. 598, 635 (Bankr. S.D. Tex. 2018). A debt may not be discharged under Chapter 7 of the Code if the debt is for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud under § 523(a)(2)(A). The standard of proof in a § 523(a) dischargeability action is by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

For a creditor to succeed in a nondischargeability action under § 523(a)(2)(A), the creditor must prove: (1) that the debtor made a representation; (2) that the debtor knew was false; (3) that the debtor made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied upon; and (5) that the creditor sustained a loss as a "proximate result" of its reliance. *Gen. Elec. Cap. Corp. v. Acosta (In re Acosta)*, 406 F.3d 367, 372 (5th Cir. 2005) (citing *In re Mercer*, 246 F.3d 391, 403 (5th Cir. 2001)).

The Supreme Court historically construes claims under § 523(a)(2)(A) to include the "elements that the common law has defined them to include." *Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 355, 360 (2016) (quoting *Field v. Mans*, 516 U.S. 59, 69 (1995)). Moreover, the Fifth Circuit utilizes a chronological basis to distinguish the elements of actual fraud from false pretenses and false representations. *In re Rifai*, 604 B.R. 227, 307 (Bankr. S.D. Tex., 2019) (citing *Recoveredge, L.P. v. Pentecost*, 44 F.3d. 1284, 1293(5th Cir. 1995)).

There is little proof for a creditor to show under the first element other than the debtor/defendant made a representation. For the second element under § 523(a)(2)(A), the creditor must prove an intent to deceive. *Friendly Fin. Service - Eastgate v. Dorsey (In re Dorsey)*, 505 F.3d 395, 399 (5th Cir. 2007). A court may infer the requisite intent from a "reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant

misrepresentation." *Acosta*, 406 F.3d at 372 (citing *In re Norris*, 70 F.3d 27, 30 n.12 (5th Cir. 1995)); *See also In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994) (considering the totality of the circumstances to determine the debtor's intent). In other words, an intent to deceive may be inferred where a debtor makes false representation with the knowledge that the statement will induce the creditor to act. *Manheim Auto. Fin. Servs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 133 (Bankr. N.D. Tex. 2005). Therefore, when reviewing the "intent" element of a dischargeability exception, the court must "consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor, indicating an intent to deceive the creditor." *Id.* Additionally, when a debtor acts with desire to cause a certain result or with the belief that a result is substantially certain to occur, the debtor intends that result. *Id.*

Furthermore, the creditor must prove both actual reliance and justifiable reliance which are determined by two different standards. Actual reliance is the equivalent of causation-in-fact, which is defined as a "substantial factor in determining the course of conduct that results in ... loss." *Mercer*, 246 F.3d at 413 (emphasis removed) (citing Restatement (Second) of Torts § 537 cmt. a (Am. L. Inst. 1977)). This level of reliance "requires little of the creditor." *Mercer*, 246 F.3d at 413 (citing *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 284 (11th Cir. 1995)).

On the other hand, justifiable reliance, described as "an intermediate level of reliance," is a subjective standard that is more relaxed than the objective reasonable reliance standard. *Field*, 516 U.S. at 74. This standard does not remove reasonableness from the equation, however, "for the greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact." *Id.* at 76. Reliance is justifiable, rather, if (1) the promisor intends to perform, and (2) the promisee has reason to believe that the agreement will be carried out. *Mercer*, 246 F.3d at 416 (citing Restatement (Second) of Torts § 544). The court must look at both

elements from the perspective of the promisee, meaning the first element is not focused on whether the promisor truly intends to perform, but whether the promisee is justified in believing that the promisor intends to perform. *Id.* The second element focuses whether any obstacle or physical impossibility makes it impossible for the agreement to be carried out. *Id.* If such an obstacle exists, the Court must determine whether the promisee knew of its existence, rendering reliance unjustifiable. *Id.* The promisee is not, however, required to investigate even if an investigation would reveal the falsity of the promisor's representation unless the falsity is "readily apparent or obvious." ***Hurst,*** 337 B.R. at 133-34; Restatement (Second) of Torts § 540.

Finally, the creditor must establish that its loss sustained is the "proximate result" or legal cause of the debtor's representation. ***State of Texas v. Am. Tobacco Co.***, 14 F. Supp. 2d 956, 967 (E.D. Tex. 1997). Proximate cause is "largely a question of foreseeability." ***First Nat'l Bank of Omaha v. O'Brien (In re O'Brien)***, 555 B.R. 771, 782-783 (Bankr. D. Kan. 2016) (citing Restatement (Second) of Torts § 548A). Reliance on the debtor's representation is a proximate cause of the creditor's loss "if the evidence shows that the loss was a reasonably foreseeable consequence of the plaintiff's reliance." ***Am. Tobacco Co.,*** 14 F. Supp. 2d at 967.

The Court finds that Plaintiffs have not met their burden that Defendant made a false representation regarding the amount of livable space and cost of the home. Simply put, there is no contract. The plans that were used are spec plans (P-12) and do not give any indication what part of the home is and is not livable space. The testimony of the parties is mixed as to the intention of the parties regarding the square footage of livable space. None of the admitted exhibits clearly indicate the total amount of square footage of the home and whether it was to be completely livable space or not. Plaintiffs have failed to meet their burden on the allegations concerning whether Defendant made any false representations on the agreed upon amount of livable space.

Defendant made representations that he could build a home of sufficient quality in a reasonable amount of time. Stevens said he was an experienced home builder that had the ability to build a home to Plaintiffs' specifications. The evidence is clear that Defendant offered to build a home for the Plaintiffs when he initially met them to remove trees from Mrs. Gabbert's property. Defendant's offer to build the home is a representation.

Based on the record before the court, Defendant did not have the capability to build the home. There is nothing in the record to support Defendant's claim that he was an experienced builder. The limited work that was done was shoddy at best. The Court has carefully reviewed the email exchanges between Jefferey Gabbert and Stevens. While the Court recognizes there will be intervening events that preclude a builder from completing a job on time, it took an inordinate amount of time (November 2020 – March 2021) to get the lumber to the property and Defendant was never able to get a framing crew to start the framing on the house.[8] Further, although there is conflicting testimony about how many times Defendant was at the job site, Mrs. Gabbert lives on the property and maintained that she only saw the Defendant a few times on the property and Defendant did not provide any real supervision of what little was done. The Court finds that over the passage of time Defendant was dilatory and non-responsive to Plaintiffs' concerns. This course of conduct shows that Defendant's statements and actions were false. The Court can infer an intent to deceive where a debtor makes a false representation with the knowledge that the statement will induce the creditor to act, and the debtor continues to engage in deceptive conduct. Defendant's conduct demonstrates that he attempted to "string" the Plaintiffs along until the Plaintiffs capitulated to Defendant's request for more money.

---

[8] The Court recognizes, and considered, that this was during the COVID pandemic. Nonetheless, Defendant nor Plaintiffs make much of the fact that the underlying facts occurred during COVID.

The Court finds that when viewing the Defendant's conduct in the aggregate over time, Defendant mislead and deceived the Plaintiffs' into believing that he could complete the job. There does not appear from the evidence adduced that Defendant was able to schedule much work on the property other than the piers and beams being built. Further, the evidence shows that Defendant did not get any required permits to build on the property, did not investigate any HOA requirements regarding home additions, and failed to schedule work in a timely fashion. The Court finds that Defendant's conduct is deceptive over the course of dealing between the parties.

The Court also finds that there is both actual and justifiable reliance present. Actual reliance is shown because the Plaintiffs would not have hired Defendant but for Defendant's representation that he was a skilled home builder that could build a home to the Plaintiffs' satisfaction. As to justifiable reliance, the evidence shows through Defendant's oral testimony that he intended to perform. The evidence also shows that Plaintiffs believed that Defendant would build a home. The text exchanges further demonstrate Plaintiff's intention to perform and the Plaintiffs reliance on those texts. Finally, Plaintiffs suffered a loss because Plaintiffs obtained a home equity loan based on the Defendant's representations that he would complete the construction of the home. In sum, all five elements have been proven. Defendant's debt to Plaintiffs is nondischargeable under § 523(a)(2)(A).

### EMBEZZLEMENT

Section 523(a)(4) states that a debt is non-dischargeable "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The plaintiff's burden to prove a violation of § 523(a)(4) is by a preponderance of the evidence. *Master-Halco, Inc. v. Sanchez (In re Sanchez),* Adv. No. 08-3431, 2009 WL 1657991, at *5 (Bankr. S.D. Tex. 2009). This Court has found that embezzlement is defined as "the fraudulent appropriation of property by a person

to whom such property was intrusted or into whose hands it has lawfully come." ***Franklin, S.S.B. v. Barnes (In re Barnes)***, 369 B.R. 298, 305 (Bankr. W.D. Tex. 2007)(citations omitted). Further, the Fifth Circuit has held that the plain language of the statute and limited congressional intent indicate that § 523(a)(4) was intended to reach those debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts. ***Id***., (*citing **Matter of Boyle***, 819 F.2d 583, 588 (5th Cir. 1987)). As such, both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtors. ***Id***. The Court does need to conduct a complete review of the record evidence because Defendant admitted in the Joint Pretrial Order that he was paid more than what Defendant purchased in materials.

The factual stipulations in the Pretrial Order show that the total amount paid for materials and construction is $45,081.00. The total amount of invoices that Plaintiffs paid is $75,300.00. Defendant did not testify as to labor costs or overhead for his business. There was no documentary proof of any costs for labor and overhead.[9] Moreover, when examining Defendant's bank accounts [(P-1) – (P-5)] the only conclusion the Court can make is that the majority of the other debits, checks, or payments made from Defendant's RBFCU account were for personal living expenses, and not expenditures that related to the Gabbert's project. As such, Defendant embezzled at least $30,219.00 ($75,300- $45,081).

---

[9] *See **Ratliff Ready-Mix, L.P. v. Pledger (In re Pledger)***, 592 Fed. App'x 296, 301 (5th Cir. Jan. 23, 2015)(finding that an affirmative defense to using trust funds for payment intended for sub-contractors is payments for overhead and actual expenses).

### DEFALCATION

The Supreme Court has held that defalcation requires a state of mind that involves an intentional wrong. ***Bullock v. BankChampaign, N.A.***, 569 U.S. 267, 273-74 (2013). The Court determined that:

> We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985). See *id.,* § 2.02 Comment 9, at 248 (explaining that the Model Penal Code's definition of "knowledge" was designed to include **1760 "'willful blindness'"). That risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation." *Id.,* § 2.02(2)(c), at 226 (emphasis added). Cf. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, n. 12, 96 S. Ct. 1375, 47 L.Ed.2d 668 (1976) (defining scienter for securities law purposes as "a mental state embracing intent to deceive, manipulate, or defraud").
> ***Id.*** at 274.

The Supreme Court also held that embezzlement, larceny, and statutory fraud apply outside the fiduciary context and that defalcation may be used to refer to nonfraudulent breaches of fiduciary duty. ***Id***. at 275 (citation omitted). Therefore, a person may be liable for embezzlement or larceny but not for defalcation. According to the Supreme Court, this Court must determine if Defendant consciously disregarded a substantial and unjustifiable risk. ***Id***. at 274. The Court cannot find Defendant's conduct was willfully blind or that Defendant consciously disregarded a "substantial and justifiable risk." The Defendant was dilatory and made promises he did not keep, but the Defendant's testimony and conduct does not indicate he was willfully blind or consciously disregarded a substantial risk. Further, there is no evidence that Defendant's conduct was a gross

deviation from the standard of conduct other contractors would provide in this situation. As such, Plaintiffs' claim for relief based on defalcation under § 523(a)(4) fails.

Because the Plaintiffs did not prove defalcation, the Court need not answer if there was a fiduciary relationship between the parties. Nonetheless, this Court has found in ***Walser v. Texas Music Group, Inc. et al (In re Antone's Records, Inc.)***, 455 B.R. 758, 780 (Bankr. W.D. Tex. 2011) that a fiduciary relationship may be based on formal or informal relations in which one person places a special confidence in another who is bound to act in good faith and with due regard for the interest of the person placing the confidence. Further, an informal fiduciary relationship may exist based upon the circumstances surrounding a moral, social, domestic, or personal relationship. ***Id***. at 782 (citation omitted). Plaintiffs failed to explain the type of fiduciary relationship between the Defendant and Plaintiffs (formal or informal) and whether the parties' relationship could be the basis for a finding of defalcation.

### TEXAS CIVIL PRACTICES & REMEDIES CODE

Tex. Civ. Prac. & Rem. Code Ann. § 134.002 (West 2013) defines theft as unlawfully appropriating property or unlawfully obtaining services as described by Section 31.03, … Penal Code.[10] Tex. Civ. Prac. & Rem. Code Ann. § 134.003(a) provides that "a person who commits theft is liable for damages …." Further, § 134.005 allows the trier of fact to award, in addition to actual damages, damages not to exceed $1,000.00, and court costs and reasonable attorney's fees.

In ***Wright v. Minardi (In re Minardi)***, 536 B.R. 171, 186-86 (Bankr. E.D. Tex. 2015), the court analyzed the interplay between the Texas Civil Practice and Remedies Code, the Texas Penal Code, and § 523(a)(4):[11]

---

[10] Tex. Penal Code Ann. § 31.03(a)(West 2023) provides that "[a] person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property."

[11] The following discussion on the TTLA is excerpted from the ***Minardi*** opinion.

The bankruptcy court found in *Minardi* that under the Texas Theft Liability Act ("TTLA"), "a person who commits theft is liable [civilly] for the damages resulting from the theft." Tex. Civ. Prac. & Rem. Code Ann. § 134.003(a). Theft is defined as "unlawfully appropriating property or unlawfully obtaining services as described by § 31.03–31.07, or 31.11–31.14 of the Texas Penal Code." *Id*. at § 134.002(a). Section 31.03(a) of the Texas Penal Code provides that a person "commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." Tex. Penal Code Ann. § 31.03(a)(West 2023).

The element of intent can be inferred from the surrounding circumstances. *Powers v. Caremark, Inc. (In re Powers),* 261 Fed. App'x. 719, 722 (5th Cir.2008)(per curiam). The intent to deprive must exist at the time of the taking. *Id.*; *Countrywide Home Loans, Inc. v. Cowin (In re Cowin),* 492 B.R. 858, 896 (Bankr. S.D. Tex. 2013). "Appropriation of property is unlawful if it is without the owner's effective consent." Tex. Penal Code Ann. § 31.03(b)(1). To recover in this context for a civil theft under the TTLA, a plaintiff must establish: (1) the plaintiff had a possessory right to property; (2) the defendant unlawfully appropriated property in violation of the theft provisions of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft. *Wellogix, Inc. v. Accenture, LLP*, 788 F.Supp.2d 523, 542 (S.D. Tex. 2011).

A person who has sustained damages resulting from theft may recover actual damages, additional statutory damages of up to $1,000, court costs and reasonable attorney's fees under this civil liability statute. Tex. Civ. Prac. & Rem. Code Ann. § 134.005; *TXCO Resources, Inc. v. Peregrine Petroleum, LLC (In re TXCO Resources, Inc.)*, 475 B.R. 781, 834 (Bankr.W.D.Tex.2012). The award of $1,000.00 statutory damages is contingent upon an award of actual damages. *Jones v. Texas Dept. of Criminal Justice*, 2009 WL 2645028, at *2 (Tex. App.–Corpus Christi 2009, no pet.). "Actual damages," within the meaning of the Act, are those

recoverable at common law. ***Beaumont v. Basham***, 205 S.W.3d 608, 619 (Tex.App.–Waco 2006, pet. denied). The Fifth Circuit has determined that embezzlement is defined as a person who lawfully obtains property but then fraudulently appropriates the property for his or her own use. ***Powers***, 261 Fed. App'x at 723. The court further found that a violation of the TTLA could include a person found liable for embezzlement. ***Id***. at 722-24.

Here, the Court has determined that Defendant has committed embezzlement. The uncontroverted evidence is that the Plaintiffs made direct payments to Defendant who put the funds in his RBFCU account for the limited purpose of buying materials and paying for services and labor for the construction of Plaintiff's home. Once the funds were deposited into Defendant's account, the Defendant admitted that he did not use all the Gabberts' money for the construction of the home, nor did he return the unused funds to the Gabberts. All three elements are met under the TTLA. As noted herein, Defendant took over $30,000 of Plaintiffs' money. Based on this, Plaintiffs may recover $30,219.00 in actual damages, and $1,000.00 in additional damages under the TTLA. Plaintiffs may also seek attorney's fees and costs in accordance with Fed. R. Bankr. P. 7054 and Local Rule 7054.

## TEXAS DECEPTIVE TRADE PRACTICES ACTS AND DAMAGES

Tex. Bus. & Com. Code Ann. § 17.41 et seq. (known as the Deceptive Trade Practices-Consumer Protection Act ("DTPA")) is a consumer-based statute that consumers may assert and recover damages when they are victims of fraud. The DTPA was enacted to protect consumers from unscrupulous individuals or businesses who provided inferior products and services, and made misrepresentations about those good or services. Plaintiffs assert that the Plaintiffs are "consumers" for purposes of the DTPA and Defendant has stipulated to same.

The DTPA's statutory framework focuses on "goods" and "services." *Id*. at § 17.45. The DTPA also allows, *inter alia*, for damages for mental anguish, economic damages, and treble damages. *Id*. at § 17.50. The Complaint makes generalized statements that Defendant committed fraud under the DTPA. Other than assertions of fraud and violations of the DTPA, the Court cannot discern any factual support for a DTPA claim. The Court agrees that Defendant embezzled money from the Plaintiffs. Further, as discussed herein, Plaintiffs at most only made generalized statements in the Complaint and at trial about experiencing mental anguish and emotional distress. There was no direct testimony as to how Plaintiffs' emotional distress and mental anguish claims manifested into any illness or sickness that Plaintiffs felt. Moreover, there was no evidence or argument how the Court should quantify and determine any amount for emotional distress and mental anguish.

The Court agrees that Defendant provided inferior services to Plaintiffs. While Mrs. Gabbert was upset with Defendant's handling of the building process, there is little evidence on Mrs. Gabbert's mental anguish and none as to how much the Court should award for Mrs. Gabbert's mental anguish. The Fifth Circuit in *Young v. Repine (In re Repine)* found that when a § 362(k) violation occurred, that the aggrieved party is required to set forth "specific information" concerning the damages caused by his emotional distress rather than relying only on "generalized assertions". 536 F.3d 512, 522 (5th Cir. 2008)(citation omitted); *Gates v. RAC Acceptance Texas, LLC (In re Gates)*, 621 B.R. 129, 138-39 (Bankr. W.D. Tex. 2020) ("Specificity is required because 'emotional damages are easier to manufacture than other types of damages,' and 'the law has always been wary of claims of emotional distress.'. '[H]urt feelings, anger and frustration are part of life,' and Gates must present evidence of a 'specific discernable injury to [her] emotional state' that is 'particularized and extensive enough to meet the specificity

requirement.'") (internal citations omitted). In this case, Plaintiffs have not met their burden on proving mental anguish or emotional distress —there is insufficient evidence and only generalized statements to establish the extent or amount of any damages for mental anguish and/or emotional distress.

In addition, Plaintiffs allege that they should be compensated for the damages to their property, including removal of all debris and remediation of the property. The Court agrees. That said, Plaintiffs provided no evidence as to the costs of remediation or removal of the debris. The Court cannot even make an educated guess as to the costs. Also, Mrs. Gabbert testified that her husband knocked down the beams and some of the piers fell down as a consequence. Mr. Gabbert did this out of concern that the grandchild might be injured if playing on the property. While the Court appreciates the Gabberts' concerns, it begs the question if the Plaintiffs could have mitigated their damages. The only testimony on mitigation was that Mr. Gabbert put some of the lumber to protect it the Gabberts' garage. While the Court is inclined to compensate the Gabberts' for their economic damages, there is insufficient proof of same.

Finally, the Court could award treble damages if Defendant acted intentionally in causing economic damages. Here, the embezzlement is uncontested – Defendant took the Gabberts' money. Embezzlement is an intentional tort. The Fifth Circuit has explained that:

> Most often, an intentional tort requires either objective substantial certainty of harm or subjective motive to do harm. Indeed, the presence of one of these factors is both necessary and sufficient for a tort to be classified as an "intentional tort" under the traditional modern definition.
>
> *See* Kenneth J. Vandevelde, *A History of Prima Facie Tort: The Origins of a General Theory of Intentional Tort,* 19 Hofstra L. Rev. 447, 447 (1990) (describing "intentional torts" as those where "the defendant acted with the intent to injure the plaintiff or with substantial certainty that his action would injure the plaintiff").

*In re Miller*, 156 F.3d 598, 604 (5th Cir. 1998).

Section 17.50(b)(1) of the DTPA states that:

(b) In a suit filed under this section, each consumer who prevails may obtain:

(1) the amount of economic damages found by the trier of fact. If the trier of fact finds that the conduct of the defendant was committed knowingly, the consumer may also recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of economic damages; or if the trier of fact finds the conduct was committed intentionally, the consumer may recover damages for mental anguish, as found by the trier of fact, and the trier of fact may award not more than three times the amount of damages for mental anguish and economic damages[.]

Based upon a plain reading of § 1750(b)(1), any award for damages, including treble damages, under the DTPA must be based upon a Court's finding that Plaintiffs experienced emotional distress or mental anguish. As stated herein, the Court cannot make any such findings because there is no evidentiary support for emotional distress or mental anguish damages. In addition, DTPA § 17.50(b)(1) does provide for an award of treble damages for economic damages. The Complaint asserts that Defendant "must now pay for remediation, consisting of clearing the work area of useless materials, demolishing existing useless construction, …." (ECF No. at ¶ 4.12). Plaintiffs provided no proof of this at trial. As such, the Plaintiffs' claims for relief under the DTPA are denied for lack of evidence.

## CONCLUSION

For the reasons stated herein, Judgment is **GRANTED** in favor of Plaintiffs pursuant to 11 U.S.C. § 523(a)(2) and (a)(4)**.**

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that Plaintiffs are awarded a nondischargeable judgment under 11 U.S.C. 523(a)(2)(A) and 523(a)(4) in the amount of $30,219.00 in actual damages, and $1,000.00 in additional damages under the TTLA.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that Plaintiffs may seek attorney's fees and costs pursuant to Fed. R. Bankr. P. 7054 and Local Rule 7054 within fourteen (14) days of entry of this Memorandum Opinion.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that Plaintiffs' counsel file with the Court a form of Judgment consistent with the Court's Memorandum Opinion within 7 days of entry of this Memorandum Opinion.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that all other relief not expressly granted in this Memorandum Opinion is **DENIED**.

# # #